UNITED STATES of America, Plaintiff,

v.

Shahid RIKY, et al., Defendants.

No. 86 CR 643–2.

United States District Court,
N.D. Illinois, E.D.

Aug. 7, 1987.

Roger Markley, William Spence, Asst. U.S. Attys., Chicago, Ill., for plaintiff.

Patrick S. Coffey, U.S. Federal Defender Program, Thomas D. Decker, Richard H. McLeese, Thomas D. Decker & Associates, Chicago, Ill., for defendants.

## MEMORANDUM OPINION

BRIAN BARNETT DUFF, District Judge.

This prosecution arises out of an alleged money laundering scheme run by defendants Ghulam Mustafa, Shahid Riky, Ghulam Polani, and Aijaz Zaidi, also known as Syed Zaidi. The government brought a 23–count indictment alleging violations of the wire fraud statute, 18 U.S.C. § 1343, the Bank Secrecy Act, 31 U.S.C. §§ 5313 and 5322(b), and 18 U.S.C. § 2.

Before the court are defendant Riky's motions to dismiss Counts two, five and six, and twenty through twenty-three of the indictment. Those motions are granted.

## FACTS

The following facts are alleged in the indictment and, for the purposes of this motion, are presumed to be true.

In early April, 1985, IRS Special Agent Ronald Reger, using the assumed name Ronald Rossi, met with Ghulam Mustafa. Mustafa was led to believe that Rossi distributed narcotics and other drugs and wanted to conceal the money he had earned. Mustafa explained that he could help Rossi launder the cash by purchasing cashier's checks in amounts less than $10,-000 and sending the checks overseas. Mustafa was given $27,000, a commission, and the costs of the cashier's checks and the wire transfers. He entered the First National Bank of Chicago with the $27,000, and one day later he reported that three transactions had been completed and the money sent abroad.

On at least a dozen other occasions over the next eight months, Mustafa performed similar services for Rossi. Mustafa introduced Rossi to Shahid Riky, Ghulam Pola-

ni, and Aijaz Zaidi, and they began to participate in the money laundering scheme as well. Together the four of them laundered approximately $1,573,000.

## DISCUSSION

### Count 2

Count 2 of the indictment charges Mustafa and Riky with wire fraud, the elements of which are (1) a scheme to defraud; and (2) the use of the wires in furtherance of that scheme. 18 U.S.C. § 1343; *United States v. Lovett*, 811 F.2d 979, 985 (7th Cir.1987); *United States v. Bonansinga*, 773 F.2d 166, 168 (7th Cir.1985).[1] Since Riky does not contend that the indictment fails to allege the use of the wires, the only question is whether the government has charged the defendants with engaging in a fraudulent scheme.

According to the indictment, the scheme to defraud had two purposes:

A. to defraud the United States by impairing, obstructing, and defeating the lawful government functions of the Department of Treasury:

(i) in the collection of data and reports of currency transactions at financial institutions in excess of $10,000.00; and

(ii) in the obtaining of accurate and truthful information and data to be used to determine the correct source and amount of income and in the determination and assessment of income taxes; and

B. to obtain money and property, namely "fees" for money laundering, by means of false and fraudulent statements, pretenses and representations, well knowing said statements, pretenses and representations were false when made.

■ In the recent case of *McNally v. United States*, —— U.S. ——, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987), the Supreme Court limited the scope of the mail fraud statute to schemes designed to deprive the victim of his or her property rights, and

rejected the notion that the requisite scheme could be one that deprived people of merely "intangible rights" such as the right to good government. *See e.g., United States v. Holzer*, 816 F.2d 304 (7th Cir. 1987). As a result, the first branch of the scheme alleged here is cognizable under the wire fraud statute only if the obstruction of information relating to currency transactions and income infringes on a tangible right. Three courts have addressed this issue.

In *United States v. Richter*, 610 F.Supp. 480 (N.D.Ill.1985), Judge Aspen opined that CTRs are essentially information as opposed to money or property, and thus could not be considered a tangible economic right. *Id.* at 494 n. 22. Several months later, another court in this circuit reasoned that while it was true that the government technically was deprived of raw information only, that information was directly relevant to an important economic right—the collection of income taxes—and upheld the indictment. *See United States v. Gimbel*, 632 F.Supp. 748, 758–59 (E.D.Wisc.1985) (Curran, J.). *Gimbel* was followed by the Fifth Circuit in *United States v. Herron*, 816 F.2d 1036, 1040–41 (5th Cir.1987).

Each of these cases, however, was decided prior to the Court's ruling in *McNally*. *McNally* dealt with a kickback scheme in which a government official, acting on behalf of the state, selected an insurance agency which agreed to share commissions above a certain dollar amount with companies owned by the official and his friends. The defendants were convicted, and appealed on the ground that the charged scheme was not cognizable under the wire fraud act. The Supreme Court agreed, and reversed their convictions. It noted that the jury was not required to find that the state was deprived of any money, or even of any control over that money. The only fraudulent act alleged, it found, was a failure to disclose information. —— U.S. at —— and n. 9, 107 S.Ct. at 2882 and n. 9.

In this case, the alleged deprivation also is informational. It cannot seriously be

1. Cases construing the mail fraud statute are, of course, equally applicable to the wire fraud statute. *United States v. Soteras*, 770 F.2d 641, 645 n. 5 (7th Cir.1985).

contended that the CTRs or income information are property belonging to the government; instead they are important only insofar as they alert the government to items in which they may have a property interest. While the indictment suggests that defendants' schemes may have deprived the government of tax revenues, it does not allege any facts from which this court could conclude that that was in fact the case. The chain of causation is too attenuated to permit a reasonable inference that the government was deprived of a tangible interest.

*United States v. Herron, supra,* the leading case to the contrary, cannot be followed because it conflicts with *McNally. Herron* adopts the reasoning of the *Gimbel* court that the information must have had economic value or else the government would not be trying to get it. *See United States v. Gimbel, supra* at 758–59; *United States v. Herron, supra* at 1040. Under this reasoning, almost any scheme to defraud could be said to have deprived someone of a property interest. Since *McNally* mandates that the mail and wire fraud statutes be construed narrowly, this court must take a different path.

▪ It also may be argued that "[t]he ultimate aim of a money laundering scheme ... is to deprive the government of taxes." *Gimbel, supra* at 759. Yet the legislative history of the Bank Secrecy Act reveals that the purpose of requiring CTRs was to establish "paper trails" by which the government could trace white collar criminals. Identifying income tax evaders was only a secondary purpose. See H.R.Rep. No. 91–975, 91st Cong. 2d Sess. (1970), *reprinted in* 1970 U.S.Code Cong. and Admin.News. 4394–4408. Thus it cannot be presumed that the defendants would not have devised the alleged scheme but for a desire to evade income taxes.[2] Furthermore, it is worth noting that the defendants were not charged with aiding and abetting income tax evasion. *See* 18 U.S.C. § 2; 26 U.S.C. § 7201.

▪ The second branch of Count 2, which charges defendants with obtaining fees for money laundering, fares no better. Riky very persuasively argues that, according to the indictment, Rossi was not defrauded: he paid for money laundering services, and he received them. He thus was not deprived of anything of value by means of false statements. The only other possible victim is the United States government, but as was discussed earlier, the United States was not deprived of any tangible good. Accordingly, Count 2 is dismissed.

*Counts 5 and 6*

▪ Count 5, directed against Mustafa and Riky, and Count 6, directed against Riky alone, charge that defendants were acting as financial institutions and failed to file CTRs in violation of 31 U.S.C. §§ 5313 and 5322(b). According to 31 C.F.R. § 103.11(e), a financial institution is defined as follows:

(e) *Financial institution.* Each agency, branch, or office within the United States of any person doing business in one or more of the capacities listed below:

(1) A bank (except bank credit card systems);

(2) A broker or dealer in securities;

(3) A person who engages as a business in dealing or in exchanging currency as, for example, a dealer in foreign exchange or a person engaged primarily in the cashing of checks;

(4) A person who engages as a business in the issuing, selling, or redeeming of travelers' checks, money orders, or similar instruments, except one who does so as a selling agent exclusively or as an incidental part of another business;

(5) A licensed transmitter of funds, or other person engaged in the business

---

**2.** The government argues that mail and or wire fraud prosecutions have been used against income tax evaders, citing *United States v. Alexander,* 741 F.2d 962 (7th Cir.1984), and *United States v. Lynch,* 699 F.2d 839 (7th Cir.1982). In those caes, however, the claimed income tax evasion was not nearly so attenuated as it is here, where the loss of taxes is at most an incidental benefit of the scheme.

of transmitting funds abroad for others;

(6)(i) A casino or gambling casino licensed as a casino by a State or local government and having gross annual gaming revenue in excess of $1,000,000.

(ii) A casino or gambling casino includes the principal headquarters and any branch or place of business of the casino or gambling casino.

Riky argues that he cannot be a financial institution because he is not an "agency, branch, or office within the United States." While there are numerous cases that hold that a person can be a financial institution, none of them addressed this precise argument. Instead they looked to 31 C.F.R. § 103.11(e)(3) above, and omitted any reference to the first ten words of the regulation. *See e.g., United States v. Hernando Ospina,* 798 F.2d 1570, 1578–79 (11th Cir. 1986); *United States v. Mouzin,* 785 F.2d 682, 689 (9th Cir.1986); *United States v. Dela Espriella,* 781 F.2d 1432, 1436–37 (9th Cir.1986); *United States v. Goldberg,* 756 F.2d 949, 953 (2d Cir.), *cert. denied,* 472 U.S. 1009, 105 S.Ct. 2706, 86 L.Ed.2d 721 (1985). The sole case to the contrary, which did not discuss the issue, is *United States v. Gimbel,* 632 F.Supp. 713, 721 n. 10 (E.D.Wis.1984).

This court will align itself with the district judge in *Gimbel.* A recent amendment to the regulation quoted above changes the first ten words to "each agent, agency, branch, or office within the United States." *See* Amendments to Implementing Regulations Under the Bank Secrecy Act, 52 Fed.Reg. 11436, 11441 (1987) (to be codified at 31 C.F.R. § 103.11). This change in the regulation is very significant. It indicates that the government also thought it would not be able to indict persons acting as defendants allegedly have. In conjunction with the clear and unambig-

uous words of the statute, it compels the conclusion reached herein.

Although the government has not made any arguments contrary to this ruling, two possibilities come to mind. The first is that an agency describes a relationship as well as a physical place of business, and that defendants were alleged to be agents acting on behalf of Rossi and possibly others. This interpretation is not true to the words of the statute, however, which uses "agency," "branch," and "office" as parallel terms. A second argument might focus on the definition of financial institution in 31 U.S.C. § 5312(a)(2) instead of the one given in the regulations. This definition does not contain the limiting words "agency, branch, or office," yet it also does not contain any description within which Riky's alleged conduct might fit. Thus neither one of these arguments persuades this court to rule differently. Counts 5 and 6 are dismissed.[3]

*Counts 20–23*

Counts 20 through 23 also allege violations of the Bank Secrecy Act, but with a slightly different twist. Instead of holding Mustafa and Riky directly liable for not filing CTRs, in these counts of the indictment the government charges that they are derivatively liable for causing banks to not file CTRs. *See* 18 U.S.C. § 2.[4] The government's theory is that the defendants intentionally divided a transaction of over $10,000 in currency into smaller transactions so that they would not trigger the banks' reporting requirements under 31 U.S.C. § 5313 and 31 C.F.R. § 103.22. This theory, while appealing, is insufficient to state a claim for the reasons set out below.

Section 2 of Title 18 was enacted to hold criminally liable those who cause others to commit crimes, regardless of whether the defendant has the legal capacity to commit the crime or whether the intermediary has the requisite intent. *See United States v. Heyman,* 794 F.2d 788, 791 (2d Cir.1986). Thus if defendant allegedly precipitated an

---

**3.** This court has reconsidered its ruling of April 10, 1987 in light of the new arguments put forth by defendant Riky. Count seven against defendant Polani also will be dismissed by separate order upon an appropriate motion.

**4.** 18 U.S.C. § 2 provides, in relevant part:
Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, in punishable as a principal.

act which if done by the banks would be illegal, then this indictment cannot be dismissed.

■ The critical issues are: (1) what is the alleged act which the defendant caused the bank to do? and (2) is that act illegal when done by a bank? In answer to the first question, either the defendants caused the bank to break up a single transaction in excess of $10,000, or they caused the bank to not aggregate a number of smaller transactions. It is clear that the bank has no duty to aggregate transactions. The instructions on the CTR form do not impose such a duty because they were not promulgated pursuant to the Administrative Procedure Act. *See United States v. Reinis,* 794 F.2d 506, 508 (9th Cir.1986); *United States v. Richter, supra* at 489 n. 14. It is also clear that banks do have a duty to not intentionally break up a transaction. They are required to file the CTRs, and to deliberately arrange transactions so that they need not file would be a violation of that duty. *See United States v. Thompson,* 603 F.2d 1200, 1203–04 (5th Cir.1979).

■ In this case, what defendants allegedly caused the bank to do was to not aggregate. They could not have caused the bank to break up the transactions because they themselves did that. The cases holding to the contrary on this point have not focused sufficiently on what the illegal act is. *See, e.g., United States v. Tobon-Builes,* 706 F.2d 1092 (11th Cir.1983); *United States v. Shearson Lehman Brothers, Inc.,* 650 F.Supp. 490 (E.D.Pa.1986); *United States v. Gimbel, supra; United States v. Richter, supra.* For example, in *United States v. Richter,* the court stated:

> The alleged offense is intentionally causing the bank to not file a CTR. What *caused* the failure was the act of breaking up the large sums into smaller ones. Under § 2 it is these acts, "if directly performed by" bank officials which would violate § 5313.

*Id.* at 489 (footnote omitted; emphasis in original). This court respectfully cannot follow that reasoning. The breaking up process was not caused, it was done. The only effect that might have been caused

was a failure to aggregate, and that omission is not a crime.

Although the Seventh Circuit has not dealt with this issue, cases supporting this result may be found in the First, Eighth, and Ninth Circuits. *See United States v. Larson,* 796 F.2d 244, 247 (8th Cir.1986); *United States v. Varbel,* 780 F.2d 758, 762 (9th Cir.1986); *United States v. Anzalone,* 766 F.2d 676, 683 (1st Cir.1985). The Second, Fifth and Eleventh circuits have reached the opposite conclusion. *See,* respectively, *United States v. Heyman, supra; United States v. Thompson, supra;* and *United States v. Tobon-Builes, supra.* In both *Heyman* and *Thompson,* however, the persons allegedly structuring the transactions were employees of the financial institutions, while in this case there is no indication that the banks had any knowledge that the transactions were arranged for a particular purpose. *Tobon-Builes* followed the reasoning of *United States v. Richter* which, for reasons previously stated, this court declines to adopt.

### CONCLUSION

Counts two, five, six, and twenty through twenty-three are dismissed.