**UNITED STATES of America, Plaintiff,**

v.

**Anthony PARIS and Marie Barbieri, Defendants.**

**No. 84 CR 196.**

United States District Court,
E.D. New York.

May 13, 1988.

Andrew J. Maloney, U.S. Atty., Brooklyn (Julie Copeland, of counsel), for U.S.

Richard A. Rehbok, New York City, for Paris.

Maurice H. Sercarz, Sercarz, Schechter & Lopez, Brooklyn Heights, N.Y., for Barbieri.

### MEMORANDUM AND ORDER

PLATT, Chief Judge.

Defendants have jointly moved to strike all seven counts of the pending indictment. Defendant Barbieri also requests release on bail. For the reasons noted below, both motions are denied.

*Facts Alleged*

Defendants Anthony Paris and Marie Barbieri were charged in 1984 in a seven count indictment with various violations stemming from transactions allegedly structured to avoid currency reporting requirements.[1] The indictment includes the following allegations:

1. Count 1 alleges that both defendants conspired between January 1980 and December 1981 to conduct currency transactions in such a fashion as to prevent banks from complying with transaction reporting requirements administered by the Internal Revenue Service. The overt acts alleged are substantive violations of the Currency and Foreign Transactions Reporting Act, 31 U.S.C. § 1081 (1976) (currently found with minor changes at 31 U.S.C. § 5313(a) (1982)), and of the false statement statute, 18 U.S.C. § 1001 (1982).

2. Count 2 alleges that both defendants caused banks to fail to file Currency Transaction Reports (CTR's) as part of a pattern of illegal activity involving transactions exceeding $100,000 in a twelve-month period;[2] and,

3. Counts 3 through 7 allege that defendant Barbieri exchanged cash for travelers checks at three separate Barclays Bank branches on March 9, 1981, March 13, 1981, March 17, 1981, March 20, 1981, and March

---

1. Defendants were first arraigned in 1988 because they had refused to appear at earlier court appearances.

2. CTR's are the forms on which banks provide the Treasury Department with currency transaction information.

26, 1981. On each day, she allegedly exchanged less than $10,000 at each branch, but the total amount exchanged at Barclays Bank in the New York area each day exceeded $10,000. Her conduct allegedly violated 18 U.S.C. section 1001 as fraudulent concealment of a material fact.

*Statutes and Regulations*

The statutes which defendants are charged with violating have undergone some evolution since defendants were first indicted. The indictment's core is Count 2, which alleges a violation of then-designated section 1081. *See* 31 U.S.C. § 1081 (1976) (currently found at 31 U.S.C. § 5313(a) (1982)). This statute was passed into law in 1970 as the Currency and Foreign Transactions Reporting Act, Pub.L. No. 91–508, §§ 221–223, 84 Stat. 1122. It was recodified with no substantive changes in 1982. *See* Act of Sep. 13, 1982, Pub.L. No. 97–258, 96 Stat. 996. In 1986, Congress specifically outlawed structuring transactions to avoid the reporting requirement. *See* 31 U.S.C.A. § 5324 (West Supp.1986). Of course, this statute is inapplicable to the charges facing defendants and does not affect prosecutions brought under the original statute.

The Currency and Foreign Transactions Reporting Act, Public Law 91–508, 31 U.S.C. § 5313 *et seq.*, "requires reports of cash transactions involving such amounts or taking place under such circumstances as the Secretary of the Treasury shall by regulation prescribe." H.R.Rep. No. 975, 91st Cong., 2d Sess., *reprinted in* 1970 U.S. Code Cong & Admin.News 4394, 4396. The statute reads as follows:

> When a domestic financial institution is involved in a transaction for the payment, receipt, or transfer of United States coins or currency (or other monetary instruments the Secretary of the Treasury prescribes), in an amount, denomination, or amount and denomination, or under circumstances the Secretary prescribes by regulation, the institution and any other participant in the transaction the Secretary may prescribe shall file a report on the transaction at the time and in the way the Secretary prescribes.

31 U.S.C. § 5313(a).

Thus, determining whether the facts alleged constitute a crime depends at least in part on the language of the Secretary's regulations. In pertinent part in 1980 and 1981, the regulations provided thus:

> Each financial institution shall file a report of each deposit, withdrawal, exchange of currency, or other payment or transfer, by, through, or to such financial institution, which involves more than $10,000. Such reports shall be made on forms prescribed by the Secretary and all information called for in the forms shall be furnished.

31 C.F.R. § 103.22 (1980 & 1981).

The Treasury regulations were not a model of clarity in 1980 and 1981. Determining the circumstances under which a bank had to file a CTR was not self-evident.[3] The regulations did not specifically bar bank customers from breaking down transactions involving more than $10,000 into multiple transactions involving less than $10,000. The phrase "financial institution" did not clearly distinguish between a bank, including all of its branches, and a single branch of a bank. Although the CTR's themselves included language requiring banks to aggregate separate daily transactions totaling more than $10,000, if they were aware of such other transactions, *see United States v. Heyman*, 794 F.2d 788, 789 n. 2 (2d Cir.), *cert. denied*, 479 U.S. 989, 107 S.Ct. 585, 93 L.Ed.2d 587 (1986), the regulations themselves did not specifically require aggregation of separate transactions.

The regulations' lack of clarity and the absence of a customer's duty to file CTR's has not forestalled prosecutions in all cases. Customers may be charged with causing banks to fail to file CTR's even if they themselves have no duty to file. *See id.* at 791; 18 U.S.C. § 2(b) (1982). A customer's actual inability to commit the crime

---

**3.** A report by the United States Comptroller General dated July 23, 1981, reached the same conclusion. *See United States v. Anzalone*, 766 F.2d 676, 681 (1st Cir.1981).

of failing to file a CTR is no defense to a charge of causing a bank to fail to file a CTR. *See Heyman*, 794 F.2d at 791.

■ Charges may be brought under section 2(b) if a substantive violation is alleged, even in the absence of a specific reference to section 2(b) in the indictment. *See United States v. Perry*, 643 F.2d 38, 45 (2d Cir.1981); *United States v. Taylor*, 464 F.2d 240, 241–42 n. 1 (2d Cir.1972). Since section 2(b) requires proof of willfulness, any danger that a defendant will be prejudiced by unclear regulations is cured by requiring proof of sufficient intent. *See Heyman*, 794 F.2d at 792.

■ Prosecutions directly under the currency reporting statute were not the only means in 1980 and 1981 of sanctioning violations of the reporting requirements. The false statement statute was also available. *See* 18 U.S.C. § 1001 (1976). "[P]articipation in a scheme to conceal material facts from the government, quite apart from the affirmative misstatement of facts, is a crime. The text of § 1001 specifically provides for prosecution of such schemes in a clause separate from the clause which describes the offense of affirmative false statements." *United States v. Culoso*, 461 F.Supp. 128, 132–33 (S.D.N.Y.1978). Reading *Culoso* in conjunction with section 2(b), customers' schemes which deprive the government of material information by causing banks to fail to file CTR's are actionable under this statute as well as under 31 U.S.C. section 5313(a). *See United States v. Nersesian*, 824 F.2d 1294, 1312–13 (2d Cir.) ("[B]ank customers who intentionally and with knowledge of the reporting requirements structure their transactions so as to circumvent or prevent a bank from complying with those requirements commit a crime.") (dicta), *cert. denied*, ——— U.S. ———, 108 S.Ct. 357, 98 L.Ed. 2d 382 (1987); *United States v. Richeson*, 825 F.2d 17, 20 (4th Cir.1987) (defendant's "willful intent to cause a concealment, combined with the financial institution's duty to report and its innocent failure to report, constitute the elements of actionable concealment under Section 1001").

*Legal Theories of Criminal Liability*

Because the Second Circuit's analysis of similar cases has been inconsistent, *see* discussion *infra*, a review of the applicable caselaw interpreting the statutes and regulations is helpful to understanding the issues raised by the pending indictment and defendants' motions. Prosecutions resting on two different theories of criminal liability have been upheld. Both theories have sustained prosecutions under 18 U.S.C. section 2(b) of violations of both substantive criminal statutes, 31 U.S.C. section 5313 and 18 U.S.C. section 1001. These theories differ as to a bank's duty to file CTR's in certain circumstances, and the permissibility of customers structuring transactions in certain ways.

A. *Structural Liability*

The term "structural liability" is an invention of this Court, but it summarizes the essence of the broadest theory of criminal liability advanced by the courts in the currency reporting requirement cases. *See United States v. Tobon–Builes*, 706 F.2d 1092, 1098 (11th Cir.1983) (naming the theory "a sensible, substance-over-form approach"). The structural liability theory permits prosecution of any alteration by a bank's customers of a financial transaction with the intent to prevent a bank from filing a CTR. The method selected by the customer to prevent the bank from fulfilling its duty to file CTR's is irrelevant to a customer's criminal liability under this theory. Presumably, customers could be prosecuted for making a series of single daily transactions at a bank on different days, with each daily transaction totalling less than $10,000, if done with the requisite criminal intent. Although banks have no duty to aggregate daily transactions over time, structuring transactions in this fashion causes a bank to fail to file a CTR. Thus, the criminal act is the act of restructuring to avoid reporting itself, not the actual process of entering the bank and carrying out the restructured transaction in a particular manner.

Two precepts buttress the structural liability theory:

1. Since banks have a duty to file CTR's if a transaction involves more than $10,000, any modification of a financial transaction, with the intent to avoid the filing of a CTR, is improper; and,

2. if a bank official may be held criminally liable for structuring a transaction to negate a bank's responsibility to file a CTR, so too may a customer be held liable for similarly structuring any financial transaction. Thus, if a bank officer could be held liable for taking a depositor's $100,000, and then depositing the funds on eleven consecutive business days, with each deposit amounting to less than $10,000, so too could a bank's customer be held criminally liable for so acting without a bank officer's cooperation, so long as the customer acted willfully to avoid the reporting requirement.

Two district court opinions include the purest expression of the structural liability theory. *See United States v. Shearson Lehman Bros., Inc.*, 650 F.Supp. 490, 493–94 (E.D.Pa.1986); *United States v. Richter*, 610 F.Supp. 480, 488–90 (N.D.Ill.1985), *aff'd*, 785 F.2d 312 (7th Cir.), 793 F.2d 1296 (7th Cir.), *cert. denied*, 479 U.S. 855, 107 S.Ct. 191, 93 L.Ed.2d 124 (1986); *see also United States v. Cook*, 745 F.2d 1311, 1315 (10th Cir.1984). Dicta suggests that if it were required to select a theory of liability, the Second Circuit would adopt the structural liability theory. *See Heyman*, 794 F.2d at 791–92. *But see Nersesian*, 824 F.2d at 1312 (not adopting structural liability analysis). A district court opinion squarely adopting structural liability was recently reversed by the Seventh Circuit Court of Appeals. *Compare United States v. Gimbel*, 632 F.Supp. 748 (E.D. Wis.1985) *with United States v. Gimbel*, 830 F.2d 621 (7th Cir.1987).

### B. *Transactional Liability*

Transactional liability, another term originated by this Court, permits prosecutions only if defendants are accused of structuring financial transactions which, had a bank been provided full disclosure of a customer's conduct, would have required a bank to file a CTR. For example, unlike the result under the structural liability theory, transactional criminal liability would not attach to a series of single daily transactions at a bank, with each daily transaction totalling less than $10,000, even if the transactions were so conducted solely to avoid the reporting requirement. *See Nersesian*, 824 F.2d at 1312 ("[T]ransactions occurring on different days at the same financial institution are not aggregated to constitute a single transaction so that a bank would have to file a CTR.").

Transactional analysis requires courts to examine the details of a charged money laundering scheme to determine whether, given the method carried out by the perpetrators, full disclosure of their conduct to a bank would have compelled the bank to file a CTR. Single transactions at one bank's branch in one day which involve more than $10,000 and which are not reported because a customer and a bank officer allegedly cooperate to prevent the bank from filing a CTR are usually actionable on the transactional theory. *See United States v. Hayes*, 827 F.2d 469, 472 (9th Cir.1987); *United States v. Sans*, 731 F.2d 1521, 1531–32 n. 12 (11th Cir.1984), *cert. denied*, 469 U.S. 1111, 105 S.Ct. 791, 83 L.Ed.2d 785 (1985). *But see United States v. Risk*, 672 F.Supp. 346, 356–58 (S.D.Ind.1987).

Multiple transactions on a single day at a single bank's branch, each of which is under $10,000, but totalling more than $10,000 per day, which are not reported because they were so divided by the customer have been found actionable on a transactional theory. *See Nersesian*, 824 F.2d at 1312–13 (adopting transactional analysis); *United States v. Bank of New England, N.A.* 821 F.2d 844, 849 (1st Cir.), *cert. denied*, — U.S. —, 108 S.Ct. 328, 98 L.Ed. 2d 356 (1987); *cf. Heyman*, 794 F.2d at 789–90 (facts alleged, although court adopted structural liability theory). *But see Gimbel*, 830 F.2d at 624–26 (facts alleged).

Single daily transactions at separate banks, each of which is less than $10,000 per bank but which total more than $10,000 among all banks, have sometimes been held actionable. *See United States v. Massa*,

740 F.2d 629, 645 (8th Cir.1984), *cert. denied*, 471 U.S. 1115, 105 S.Ct. 2357, 86 L.Ed.2d 258 (1985). *But see United States v. Denemark*, 779 F.2d 1559, 1563 (11th Cir.1986); *United States v. Varbel*, 780 F.2d 758, 762–63 (9th Cir.1986). Transactional liability would only accrue on such facts if a bank must aggregate transactions conducted at other banks on a single day when a bank is aware of such transactions.

Single day transactions conducted at separate branches of the same bank, with each transaction at each branch under $10,000 but which total more than $10,000 per bank including all branches, have been sustained on the transactional theory. The transactional theory requires that a bank must aggregate separate daily transactions at all of its branches if it is aware of such separate transactions and they trigger the $10,-000 filing requirement. *See United States v. Cure*, 804 F.2d 625, 629–30 (11th Cir. 1986); *United States v. Giancola*, 783 F.2d 1549, 1552–53 (11th Cir.) *cert. denied*, 479 U.S. 1018, 107 S.Ct. 669, 93 L.Ed.2d 721 (1986); *United States v. Sanchez Vasquez*, 585 F.Supp. 990, 993 (N.D.Ga.1984). *But see United States v. Reinis*, 794 F.2d 506, 508 (9th Cir.1986); *United States v. Riky*, 669 F.Supp. 196, 201 (N.D.Ill.1987). Two circuits have specifically declined to apply the transactional liability theory to such facts, and refused to decide whether structuring in this fashion may be improper on this theory. *See Nersesian*, 824 F.2d at 1312; *Bank of New England*, 821 F.2d at 850.

*Theories Barring Liability*

Defendants accused of illegally structuring transactions have avoided criminal liability on three grounds. First, some courts have completely rejected the structural liability theory and found no liability under transactional analysis. *See Gimbel*, 830 F.2d at 625–26; *Risk*, 672 F.Supp. at 356–57. Second, many courts have applied transactional liability and determined that the manner in which the defendant executed his scheme did not impose a duty on a bank to file a CTR even if the defendant had fully disclosed his scheme to the banks in which he made his transactions. Thus, such courts have refused to hold such defendants criminally liable. *See Denemark*, 779 F.2d at 1563; *Varbel*, 780 F.2d at 762–63. Third, transactional liability has also been barred on the separate ground that the Treasury Department's regulations did not clearly inform bank customers that structuring a transaction in a certain manner would be improper. *See United States v. Anzalone*, 766 F.2d 676, 681–82 (1st Cir. 1985).

*Defendants' Liability in this Case*

■ As a federal district court sitting in the Eastern District of New York, this Court is bound by the Second Circuit's precedents construing criminal liability under the statutes and regulations. As noted, the Second Circuit in *Heyman* appeared to adopt the structural liability analysis in dictum. All counts of the indictment in this case must stand on the structural liability theory since defendants are accused of willfully structuring financial transactions to avoid IRS reporting requirements. The factual difference between the two different schemes alleged in the indictment (small denomination bills exchanged for larger denomination bills and cash exchanged for traveler's checks) are irrelevant to defendant's potential criminal liability under the structural liability theory.

However, without reversing *Heyman*, *Nersesian* adopted transactional liability analysis. As the most recent pronouncement of the Second Circuit on this matter, *Nersesian* is entitled to some precedential weight. Under transactional liability, Counts one and two clearly remain and Counts three through seven may remain. Counts one and two clearly remain because the defendants are accused of conspiring to avoid the reporting requirements and of executing single day exchanges at one branch of one bank totalling more than $10,000 and of taking independent steps to prevent the bank from filing a CTR for such transactions. Had the bank been fully informed of the nature of such cash exchange transactions, it would have been required to file a CTR. The cash for cash exchange totalling more than $10,000 per

day alleged in Count one is analogous to the cash for checks transaction charge upheld in *Nersesian.* *See Nersesian,* 824 F.2d at 1311–1313.

Turning to Counts three through seven, the Second Circuit has specifically avoided deciding whether transactional analysis permits prosecutions for single daily transactions conducted at separate branches of the same bank, each of which is under $10,000 but which total more than $10,000. *See Nersesian,* 824 F.2d at 1312. If the language included on CTR's in 1980 and 1981 requiring banks to aggregate transactions at separate branches was sufficient to compel banks to aggregate, then transactional liability preserves Counts three through seven. *See Giancola,* 783 F.2d at 1552–53; *Sanchez Vazquez,* 585 F.Supp. at 993. However, other courts have refused to accord the CTR's language such weight and refused to extend liability because the CTR's language was not a proper rule under the Administrative Procedures Act. *See Reinis,* 794 F.2d at 508; *Shearson–Lehman,* 650 F.Supp. at 496 (adopting structural liability and preserving charges).

■ This Court believes that because the Second Circuit has not clearly adopted either structural or transactional liability, this Court should not strike Counts three through seven. If *Heyman*'s structural liability analysis governs, all counts must remain. If *Nersesian*'s transactional liability analysis governs, Counts three through seven may or may not remain. At this point prior to trial, uncertainty is enough to preserve all of the government's charges. Even if defendants are tried, convicted, appeal, and are successful in striking Counts three through seven, no prejudice will have accrued as to Counts one and two because the cash for traveler's checks transactions alleged in Counts three through seven may be introduced as overt acts of the conspiracy alleged in Count one of the indictment.

Defendants' motion to strike the indictment is hereby denied.

■ Turning to the motion for release on bail, defendant Barbieri has failed to credibly contradict evidence that she was informed of the pending charges sometime ago by her tax lawyer and failed to appear. She has been a fugitive for nearly four years. Her real estate investments have been made with substantial quantities of cash, as were the alleged money laundering transactions. She faces counts in the indictment that carry penalties of up to five years in prison and $500,000 fines. Thus, there is a serious risk that the defendant will flee based on her available financial resources and pending charges as well as her failure to appear on these charges in past years. There are no conditions of release that will reasonably assure her appearance as required before this Court. Defendant's motion for release on bail must be, and hereby is, denied.

SO ORDERED.

